UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**


CIVIL ACTION NO. 12-296- JMH

PHILLITA JILL AMMONS, Administrator
of the Estate of Sophia Ammons                    PLAINTIFF


VS.                    <u>**OPINION & ORDER**</u>


NORFOLK SOUTHERN CORPORATION
and JOHN DOE DEFENDANT                    DEFENDANTS

* * * * * * * * * * *

    This matter is before the Court on the Motion for Summary
Judgment filed by Defendants, Norfolk Southern Corporation and
John Doe Defendant ("Defendants") [DE #42] and the Motion *in
Limine* filed by Defendants, seeking to prevent Plaintiff,
Phillita Jill Ammons, Administrator of the Estate of Sophia
Ammons ("Plaintiff"), from introducing evidence regarding prior
malfunctioning of the signals at the railroad crossing [DE #
25].  These motions are fully briefed and are ripe for review.
The Court, having reviewed the record and being otherwise
sufficiently advised, will grant Defendants' motion *in limine*
and motion for summary judgment.

I.    **Factual Background**

    This case arose from an accident in which Sophia Ammons was
driving eastbound on Bohon Road in Harrodsburg, Kentucky and

drove directly into the side of a Norfolk Southern train headed westbound through the Bohon Road Crossing. As described by Plaintiff, Ammons navigated a "hard left turn" of the road leading up to the crossing and then struck the side of the lead locomotive, spinning her car violently. Ammons was thrown out of the passenger window, striking her head on a metal communications control box, killing her instantly. Plaintiff, Ammons' estate, filed suit against Defendants in the Circuit Court of Mercer County, Kentucky. Defendants removed the action to federal court based on diversity jurisdiction.

Plaintiff's lawsuit alleges that the train's engineer failed to sound the train's horn with the required two long sounds, followed by a short sound and another long sound; that the flashing warning lights at the crossing were malfunctioning; and that Sophia's view down the track towards Harrodsburg was obscured by thick vegetation. However, in their motion for summary judgment, Defendants argue that the evidence shows the whistle was sounded and the flashing lights at the crossing were operating normally on the day of the accident, and that Plaintiff has failed to create a genuine issue of fact to the contrary. According to Defendants, the evidence is that Ammons disregarded the flashing red lights and the train's horn and drove into the side of the train, which had already occupied the crossing. Defendants further argue that there is no evidence

vegetation was obstructing the signs or signals of the railroad and that, to the extent that vegetation on private property surrounding the crossing obstructed Ammons' view of the approaching train, had Ammons actually stopped at the flashing lights, as she was required to do, her visibility would have been unlimited.

## II.    **Standard**

"Under Rule 56(c) [of the Federal Rules of Civil Procedure], summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

Once the moving party shows there is an absence of evidence to support the nonmoving party's case, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). Conclusory allegations are not enough to allow a nonmoving party to withstand a motion for summary judgment. *Id.* at 343. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson,* 477 U.S. at 252. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

## III.  Analysis

Under Kentucky law, to recover against Defendants for negligence, Plaintiff must show "duty, breach of duty, and resulting injury." *Webb v. Jessamine Cnty. Fiscal Court*, 802 F. Supp. 2d 870, 888 (E.D. Ky. 2011) (citations omitted). With respect to the respective duties of Ammons and Defendants, "[i]n general, the rights and duties of a railroad company and the traveling public in the use of grade crossings are mutual and

reciprocal and each must exercise the degree of care commensurate with the danger, but trains have the right of way and all persons on the street or highway shall yield precedence to the trains." *Ill. Cent. R.R. Co. v. Arms*, 361 S.W.2d 506, 509 (Ky. 1962). The duties of a railroad company at a public crossing "are defined by statute, common law, and sometimes, by city ordinance." *Allen v. Arnett*, 525 S.W.2d 748, 750 (Ky. 1975). Under Kentucky common law, the railroad has a duty to "giv[e] adequate warning of the approach of a train, [to keep] a lookout ahead, and [to operate] the train at a speed commensurate with the care required under the circumstances." *Ill. Cent. R.R. Co.*, 361 S.W.2d at 509. By Kentucky statute, a railroad company is required to provide each locomotive engine running over its lines with a bell and whistle, which shall be rung or sounded "at a distance of at least fifty (50) rods from the place where the track crosses upon the same level any highway or crossing where a signboard is required to be maintained," and which shall be rung or "sounded continuously or alternately until the engine has reached the highway or crossing[,]" except at night, if regulated by ordinance. KRS 277.190.

Operators of motor vehicles also have certain duties when approaching and crossing a railroad track. "The duty imposed upon every man to exercise ordinary care for his own safety

requires that in approaching a railroad track, he must use his senses in a way that ordinarily prudent persons would do under similar circumstances, in order to determine whether it is safe to cross the track at that time." *Nashville, Chattanooga & St. Louis Ry. Co. v. Stagner*, 205 S.W.2d 493, 494-495 (Ky. 1947). Thus, "[a] driver of an automobile whose view is obscured or whose hearing is impaired by any condition must exercise care commensurate with the factual situation and proceed with more caution than where he has an unobstructed view." *Id.* at 494 (citations omitted). In addition, under Kentucky statute, the operator of a vehicle is required to "stop and remain standing at a railroad grade crossing" when "[a] visible electric or mechanical signal device warns of the immediate approach of a railroad train," or when "[a]n approaching train is visible and in hazardous proximity." KRS 189.560(1)(a), (1)(c).

Here, Plaintiff does not contend that the train was not under reasonable control or was not operating at a reasonable speed. Plaintiff also does not dispute that Ammons drove her car into the side of the lead locomotive of the train. Nor does Plaintiff dispute the conclusions of Defendants' expert, Kenneth R. Agent, that Ammons was traveling at approximately 35 miles per hour at the time of the collision; she did not slow as she approached the crossing; and examination of the rear filaments show that Ammons was braking when the impact occurred. Thus,

the parties appear to agree that Ammons was not aware of the presence of the train until immediately before striking it in the crossing. Rather, Plaintiff alleges that Defendants failed to comply with the duty to sound the train's horn or whistle as it approached the crossing. Plaintiff also alleges that the flashing warning lights at the crossing were malfunctioning. However, Plaintiff has failed to present sufficient evidence on which a jury could reasonably find that the train's horn did not sound or that the flashing warning lights were not functioning.

**A. Evidence Regarding the Train's Horn and the Flashing Warning Lights**

In their motion for summary judgment, Defendants rely on testimony from the engineer, Tyrone Campbell, that he blew the horn as usual as the train was approaching the Bohon Road crossing and that he could see that the flashing lights at the crossing were functioning. The conductor, Shawn Chilcote, also testified that the train's horn was blown and that the crossing lights were functioning. Plaintiff attempts to discredit this testimony by pointing out that, from the train, a person would not be able to see the front of the lights that would have been facing Ammons as she approached the crossing. However, Chilcote testified that, although he could not see the red face of the light from his perspective, he could see the back sides of the bulbs that blink on the back side of the reflectors. Chilcote

testified that he specifically recalled seeing the lights being on at the crossing on the day of the accident. Campbell similarly testified that he saw the lights flashing on both of the crossings on the day of the accident. Campbell also testified that he was positive that he was blowing the train's horn before he saw Ammons approach the intersection. Defendants also submit a sworn affidavit from Mary Anderson, an individual who lives near the Bohon Road crossing, in which she states that she heard the train whistle blow several times shortly after 9:00 a.m. on the day of the accident. She states she then heard a thump, which she thought was a car door slamming. Upon hearing the thump, she and her husband looked down to the crossing and saw that an accident had occurred.

With respect to the issue of whether the warning lights at the crossing were flashing prior to the accident, the only evidence Plaintiff has submitted that contradicts Defendants' evidence are affidavits stating that the crossing lights were not functioning on other occasions. Defendants have filed a motion *in limine* to exclude this evidence, relying on *Ayoub v. National Railroad Passenger Corp.*, 76 F.3d 794 (6th Cir. 1996). In *Ayoub*, a driver, Ayoub, drove around functioning crossing gates, disregarded flashing warning signals, and drove into the path of a passenger train. Ayoub was killed. The plaintiff (the representative of Ayoub's estate) argued "that prior signal

8

malfunctions at the crossing conditioned Ayoub to ignore the warning signals." *Id*. at 794-795. The district court awarded summary judgment to the defendants (the railroad company, train engineer, and the owner of the tracks), "holding that evidence of prior malfunctions was irrelevant when the signals were functioning properly at the time of the accident." *Id*. at 795. The Sixth Circuit affirmed, explaining:

> The evidence is undisputed that the crossing gates worked, the warning lights flashed and the train's horn sounded. Two other cars waited for the approaching train. Yet Ayoub disregarded the signals and pulled around those cars and into the crossing. Previous malfunctions at the crossing, even if verified, cannot overcome the fact that Ayoub's own negligence proximately caused his death. No reasonable jury could return a verdict for Ayoub's representatives under such circumstances.
>
> *In short, we hold that evidence of prior malfunctions of warning signals at a railroad crossing is irrelevant so long as the signals functioned properly at the time of the accident.* We fail to see a circumstance in which a plaintiff could prove that a railroad's negligence proximately caused an accident occurring after the plaintiff undisputedly disregarded properly functioning warning signals. Holding otherwise potentially could impose liability upon a railroad for any accident occurring at a crossing which had a prior warning signal malfunction which had been corrected.
>
> *Id*. at 796 (emphasis added).

The Plaintiff does not attempt to distinguish this case from *Ayoub*. Rather, Plaintiff relies on *Whitney v. Louisville & Nashville Railroad Co*, 138 S.W.2d 503 (Ky. 1940). In *Whitney*, a case involving a collision between a freight train and a semi-

trailer truck, the issue was whether the railway company had kept the electric warning signal at a crossing in proper repair. A witness who had seen the crossing from her porch immediately prior to the accident had testified that the wigwag[1] at the crossing was not working and that the electric signal began to work at about the time the engine and the truck collided. *Id*. at 504. The trial court also admitted testimony of two other witnesses who testified that, earlier on the afternoon of the accident, the electric signal did not work until the engine had crossed the crossing, and then the bell rang but the wigwag did not work. *Id*. However, the trial court excluded evidence that wigwag was working, though the light in the wigwag was not burning, the week before the accident, as well as evidence that the signal did not work within 10 days or two weeks prior to the accident. *Id*. The Kentucky Court of Appeals held that, under these circumstances, the evidence that the signal was not working properly during the two weeks prior the accident was "competent for the purpose of showing that the signal had not been in a proper state of repair for a sufficient length of time to put the Railway Company on notice of its defective condition"

[1] A "wigwag signal" is "a signal at a railway grade crossing that indicates the approach of a train by the horizontal swinging of a disk." Wigwag signal, Webster's Third New International Dictionary, Unabridged, http://unabridged.merriam webster.com/unabridged/wigwag%20signal (last visited Jan. 31, 2014).

and should have been admitted. *Id.* at 505. However, as pointed out by Defendants, *Whitney* is distinguishable in that there was evidence that the electric signal was not working *at the time of the accident*. In contrast, in this case, as in *Ayoub*, all of the evidence regarding the condition of the electric warning signals at the time of the accident is that these signals were functioning properly. Thus, just as in *Ayoub*, the evidence of prior malfunctions of the electric warning signals at the Bohan crossing is irrelevant. Accordingly, Defendants' motion *in limine* to exclude this evidence is granted and this evidence will not be considered by the Court.

Plaintiff's remaining evidence that the flashing warning lights were not working the day of the accident is an affidavit submitted from Amanda Medley, in which Medley stated: "Within the next day or so at the accident scene, I spoke with a lady who was apparently a claim agent for the railroad who said the words to the effect, 'It looks like it may be the railroad's fault. The light was not working.' She gave me her card." [D.E. 55-2]. However, Medley's affidavit fails to meet the requirements for an affidavit used to oppose a motion for summary judgment set forth in Fed. R. Civ. Pro. 56. Rule 56(c)(4) requires an affidavit used to support or oppose a motion for summary judgment "be made on personal knowledge, set out facts that would be admissible in evidence, and show that

the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. Pro. 56(c)(4). Here, Medley's affidavit fails to set out facts that would be admissible in evidence. Instead, Medley's affidavit sets forth inadmissible hearsay evidence that an unidentified claim agent with an unspecified relationship with the railroad said that it "may" be the railroad's fault because the light was not working. Although Plaintiff argues that this statement is admissible as an admission against interest under Fed. R. Evid. 804(b)(3), Rule 804 sets forth exceptions to the rule against hearsay that are applicable when the declarant is unavailable as a witness. Fed. R. Evid. 804. Here, Plaintiff makes no effort to show that the claim agent referred to by Medley (who is identified in Plaintiff's response as Senior Claim Agent Ann Brumleve) is unavailable for trial. In addition, Rule 804(b)(3) requires that the statement be one that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability." Fed. R. Evid. 804(b)(3). Again, Plaintiff makes no effort to demonstrate how the unidentified claim agent's statement about the light fits within any of these requirements. The affidavit

itself is vague as to the claim agent's status or authority, stating only that the agent was "apparently a claim agent for the railroad," and Plaintiff presents no further evidence regarding Brumleve's relationship with Defendants. Thus, it is unclear whether Brumleve was employed by the railroad, its insurance company, or perhaps some other entity. Without additional information, the Court is unable to determine whether this statement was contrary to Brumleve's proprietary or pecuniary interest or whether it could expose her to civil or criminal liability. Regardless, this inadmissible "hearsay within hearsay" evidence is simply insufficient to create a genuine issue of material fact as to whether the warning lights were functioning on the day of the accident. *See Knox v. Neaton Auto Prods. Mfg., Inc.*, 375 F.3d 451, 457 (6th Cir. 2004) (finding that a claim cannot be supported by "inadmissible hearsay within hearsay"); *Sperle v. Mich. Dep't of Corr.*, 297 F.3d 483, 495 (6th Cir. 2002) ("A party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact." (citing *Weberg v. Franks*, 229 F.3d 514, 526 n.13 (6th Cir. 2000))). For all of these reasons, Plaintiff has failed to uphold her burden of presenting evidence creating a genuine issue of material fact as to whether the flashing warning lights were working on the day of the accident.

Turning to whether the train's horn was blown prior to the time that the train entered the crossing, as previously noted, Defendants rely on testimony from Campbell, the train's engineer, that he blew the horn as usual as the train was approaching the crossing and that he was positive that he was blowing the horn before he saw Ammons approach the crossing. Defendants also rely on testimony from the conductor, Chilcote, that the train's horn was blown, as well as Mary Anderson's affidavit stating that she heard the train whistle blow several times before hearing a loud thump, which was presumably the accident. To contradict this evidence, Plaintiff submits affidavits from several witnesses stating that, on other occasions, trains either did not sound a horn at all or did not sound a horn until immediately before the crossing. However, as with the flashing lights, evidence that other trains did not sound their horns on other occasions is not relevant as to whether *this* train sounded its horn on *this* occasion. Indeed, introducing this evidence would be extremely prejudicial to Defendants because of the significant risk that Defendants would be held responsible for the failure of other trains to sound their horns on other occasions.

Aside from this inadmissible evidence, Plaintiff submits an affidavit from Brandy Kirkpatrick, a woman who lives near the crossing. According to Kirkpatrick's affidavit, the morning of

the accident, she had to take her daughter to the hospital by 10:00 a.m. She states that she "was used to the trains and when [she] would hear a train whistle while still at home, [she'd] automatically wait for 10 or 15 minutes before going to be certain that the train was fully across the track." [D.E. 55-21]. She further states that the morning of the accident, there was no whistle. However, "negative testimony, to the effect that a witness or witnesses did not hear the bell ring or whistle blow, is not sufficient to create a jury issue in the face of positive evidence that the bell was rung or the whistle blown." *Louisville & Nashville R.R. Co. v. Galloway's Adm'x*, 267 S.W.2d 90, 93 (Ky. 1954) (citations omitted). Thus, Kirkpatrick's affidavit is insufficient to create an issue of fact as to whether the train's horn was blown, in light of the evidence from the train's conductor, engineer and another bystander that the train's horn was blown.

Plaintiff also attempts to discredit Mary Anderson's statement in her affidavit that she heard a train whistle blow several times shortly after 9:00 a.m. and then she heard a thump, which she thought was a car door slamming. To contradict this statement, Plaintiff offers a letter drafted by Plaintiff's counsel after a meeting with Mary Anderson and her husband, Randy. The letter purports to summarize Plaintiff's counsels' notes about what Mary and her husband saw and heard the morning

of the accident.  In the letter, Plaintiff's counsel states that Mary told him that she heard the whistle of a train coming from Harrodsburg, recalled telling it to "shut up," poured herself a cup of coffee and walked into the living room where the TV was on.  The letter states that Mary says she did not remember hearing the whistle any further, but did hear the sounds of the wheels on the rails.  Even if the letter were considered, it is actually consistent with Mary Anderson's affidavit that she heard the train sound its horn on the day of the accident.  Even so, this letter, essentially a self-serving summary of facts drafted by counsel, is inadmissible hearsay and will not be considered by the Court.

For all of these reasons, the Court finds that Plaintiff has failed to present at least some affirmative evidence showing that there is a genuine dispute as to whether the train sounded its horn or that the electric warning signals at the Bohan Road crossing were functioning on the day of the accident.  Rather, the evidence is that the train sounded its horn and the electric warning signals were working.  As such, Ammons had a duty under Kentucky law to stop and remain standing at the crossing.  KRS 189.560.  Sadly, Ammons failed to fulfill this duty and instead drove directly into the side of the lead locomotive of the train.

**B.    Plaintiff's Allegations Regarding Excessive Vegetation**

Plaintiff further alleges that Defendants failed to comply with their obligations to control the vegetation at the crossing and that, as a result, Ammons' view of oncoming trains from Harrodsburg was blocked until the last instant before the crossing.  Plaintiff submits several affidavits from witnesses stating that, prior to the accident, the thickness of the trees made it difficult for a driver to see an approaching train until the driver was relatively close to the crossing.  Defendants point out that the railroad cannot be held responsible for trees or vegetation on private properties, hills, curves in the road, or other natural obstructions near a rail crossing.  Rather, according to Defendants, the railroad can only provide vegetation control for the purpose of visibility within its own right of way at a rail crossing.  Defendants also correctly point out that the railroad's obligations regarding vegetation is addressed by 49 C.F.R. § 213.37.  This regulation requires a railroad to control vegetation on "railroad property which is on or immediately adjacent to roadbed . . . so that it does not obstruct visibility of railroad signs and signals along the right-of-way, and at highway-rail crossings."[2]  49 C.F.R. §

---

[2]    Although 49 C.F.R. § 213.37 contains additional requirements for vegetation control, these requirements are directed at ensuring that vegetation does not interfere with railroad employee duties and are not relevant here.

213.37. Here, Plaintiff has not alleged that vegetation obstructed Ammons' view of any railroad signs and signals. In fact, the evidence is that the railroad warned Ammons of the approaching train by sounding the train's horn and by engaging the flashing warning lights. Even if her view of the approaching train was obstructed, Ammons ignored the warnings that a train was approaching, did not stop (as she was required to do) or even slow down, but instead drove directly into the train that was in the crossing.

> But where a person steps or drives in front of an approaching train which he might have observed had he looked before placing himself in a position of peril, and the point upon which he goes upon the track is so close to the approaching train that it would be impossible for those in charge of it to avoid striking him, the proximate cause of the injury he received is the result of his own negligence which bars him from recovery as a matter of law irrespective of any omission or failure of duty on the part of the trainmen.

*Hunt's Adm'r v. Chesapeake & Ohio Ry. Co.*, 254 S.W.2d 705, 709 (Ky. 1952) (citations omitted).

In *Louisville & Nashville Railroad Co. v. Fisher*, 357 S.W.2d 683 (Ky. 1962), the decedent was killed when a train struck the automobile he was driving over a railroad crossing. Plaintiff, decedent's estate, argued that the presence of vegetation on the right of way obstructed decedent's view of the train. However, this particular crossing was marked by a county yellow circular sign and a "crossbuck" sign. *Id.* at 685. "In

addition, there was an official county STOP sign" at the crossing. *Id*. The Kentucky Supreme Court concluded that, in these circumstances, there were only two possibilities: (1) either the decedent ignored the sign and did not stop, in which case, he was negligent as a matter of law, as no reasonably prudent motorist may justifiably ignore the warning of a "STOP" sign on a highway, *id.* at 689-90; or (2) the decedent complied with the law and did stop, in which case, his conduct in continuing across the track was completely careless, as he failed to use his faculties to ascertain the hazard of proceeding further. *Id*.  As the court explained:

> In the present case the STOP sign itself is a significant circumstance impelling a reasonably prudent man to look and listen.  Having obeyed the directions of the sign and taken cognizance of its warning, the motorist must exercise ordinary care in the use of his faculties to *discover the hazard* about which he has been cautioned.  Even when a plaintiff testified positively that he took precautions, we have held him guilty of contributory negligence as a matter of law if, with a clear opportunity to do so, he did not hear or see an approaching train.  *McCarter v. Louisville & Nashville R. Co.*, 236 S.W.2d 933 (Ky. 1951); *Chesapeake & Ohio Railway Company v. Trimble*, 306 S.W.2d 310 (Ky. 1957).  Surely under similar circumstances an inference of careful conduct, totally unsupported by any proof, could not be drawn.  *See Louisville & N. R. Co. v. Hyde*, 239 S.W.2d 936 (Ky. 1951), and *Louisville & Nashville Railroad Company v. Hines*, 302 S.W.2d 553 (Ky. 1957).

*Id*. at 691 (emphasis in original).

The Kentucky Supreme Court further found that, even if the railroad had negligently permitted vegetation to grow on the

right of way, thus obscuring the decedent's view of the approaching train at the "STOP" sign, an ordinarily prudent person in such circumstances would not abandon all precaution and assume he had a clear field but would instead drive forward to a point where he could determine whether he was endangered by an approaching train. *Id*. at 691-92. In other words, the presence of excessive vegetation would not give "the motorist a license to charge blindly into the intersection." *Id*. at 691. Rather, "[t]he precise warning of a STOP sign is to exercise extra care before venturing into the line of crossing traffic." *Id*. Indeed, the Court reasoned that "[t]he circumstance of obscured vision imposed on [decedent] more rather than less care." Id. at 692 (citations omitted). Thus, "[i]f the decedent actually stopped in obedience to the STOP sign, his conduct thereafter is simply inexplicable in terms of due care." *Id*. The Court concluded that "[u]nless it is due care to exercise no care to either see or hear at a railroad crossing, a jury could not justifiably find for the plaintiff." *Id*.

This Court recognizes that the above-cited cases were rendered while Kentucky courts followed the contributory negligence doctrine, under which any negligence on the part of the plaintiff was a complete bar to any recovery. In *Hilen v. Hays*, 673 S.W.2d 713 (Ky. 1984), the Kentucky Supreme Court adopted comparative fault. Under comparative fault,

"contributory negligence will not bar recovery but shall reduce the total amount of the award in the proportion that the claimant's contributory negligence bears to the total negligence that caused the damages."[3] *Id.* at 720. However, the doctrine of comparative fault does not preclude summary judgment when the plaintiff cannot demonstrate that the defendant is liable for negligence in the first place. *See Thompson v. Breeding*, 351 F.3d 732, 737-738 (6th Cir. 2003). Here, the Court finds that no reasonable jury could conclude that Defendants were negligent because Plaintiff has not put forth any evidence that Defendants breached any duty owed to Ammons. Rather, the evidence is that Defendants complied with their obligations to warn of the oncoming train, as the train's horn was sounded and the flashing warning lights were engaged.

In addition, there is no evidence that Defendants failed to comply with their duties to control vegetation so that it did not obstruct the visibility of railroad signs and signals at the crossing. To the extent that any vegetation may have obstructed

---

[3]     Defendants' motion also refers to evidence that Ammons was under the influence of and impaired by marijuana for purposes of driving a motor vehicle at the time of the collision and that she was not wearing her seatbelt. Under comparative fault, however, this evidence would not preclude Ammons' recovery entirely, but would instead be considered by the jury in determining the extent to which Ammons own negligence contributed to her injuries.

Ammons' view of the approaching train, there is no evidence that any such obstruction was the proximate cause of Ammons' injuries. Although the causation determination can be a question of both law and fact, "causation creates a question of law when 'there is no dispute about the essential facts and but one conclusion may reasonably be drawn from the evidence.'" *Petro v. Jones*, No. 11-cv-151-GFVT, 2013 WL 1856423, at *2 (E.D. Ky. May 1, 2013) (quoting *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 89, 92 (Ky. 2003)). The evidence submitted by Plaintiff is that the vegetation made oncoming trains difficult to see until just before the crossing. Even so, Plaintiff has not submitted any evidence that vegetation obstructed Ammons' view of the railroad's signs or signals warning of the oncoming train. Rather, the evidence is that Ammons ignored the warning signs that a train was approaching, failed to stop at the crossing, or even slow down, and instead drove directly into the side of the train. The only conclusion that may reasonably be drawn from this evidence is that Ammons' injuries were the result of her own failure to comply with her obligations to stop at the railroad crossing, not because vegetation obstructed her view of the train tracks as she was approaching the crossing.

Although whether or not a plaintiff acted with due care is usually a question for determination by the jury, "where reasonable minds could reach only one conclusion – that

plaintiff failed to exercise ordinary care and that his negligence was the proximate cause of his injury – it is appropriate to remove the case from the jury's consideration." *Newport v. Cincinnati, New Orleans & Tex. Pac. Ry.*, 509 F.2d 1246, 1248 (6th Cir. 1975). Here, there is no tenable basis for a finding that Ammons exercised that degree of care which would be observed by a reasonably prudent person in such a situation. Even if the railroad had permitted vegetation to grow, partially blocking the view of approaching trains, the fact remains that, had Ammons stopped at the flashing warning lights (which she was required by law to do), she would have been able to see the approaching train. Instead, Ammons apparently ignored the warnings (which were not obscured by vegetation) and drove through the intersection. As the Sixth Circuit stated in *Ayoub*, this Court "fail[s] to see a circumstance in which a plaintiff could prove that a railroad's negligence proximately caused an accident occurring after the plaintiff undisputedly disregarded properly functioning warning signals." *Ayoub*, 76 F.3d at 796.

C.    Spoliation

Finally, the Court will address Plaintiff's contention that Defendants' motion for summary judgment should be denied as a sanction for alleged spoliation of evidence by Defendants. In order to be entitled to an instruction on spoliation, the party seeking the adverse inference instruction must establish the

following: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the [evidence was] destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010) (citing *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)). District courts are granted "broad discretion in crafting a proper sanction for spoliation." *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009).

Defendants contend that the main flaw with Plaintiff's argument regarding spoliation is that there is no proof that the evidence Defendants allegedly destroyed ever existed in the first place. Here, Plaintiff first claims that the signal department responsible for maintaining the crossing flashers, and that was working on the crossing circuitry for several days after the accident, may have destroyed evidence. Plaintiff's claim is based on Justin Ammons' affidavit that one of the signal department employees working on the crossing after the accident made the statement: "Good luck finding out what happened, they will cover it up." In addition, this claim is also based on the fact that the Defendants claim an absence of any records regarding the inspection and repair of the circuitry

and flashers at the crossing after the accident, as well as a lack of records regarding why a large stack of railroad ties were brought to the area. Plaintiff speculates that these ties were brought to the area "perhaps to replace welded rails which could have broken and caused flashers not to come on." However, a hearsay statement made by an unidentified employee (who may not have even been employed by Defendants) and Plaintiff's mere suspicions that Defendants are lying about the existence of records are simply not enough to prove that these records ever existed.

Next, Plaintiff takes issue with the fact that the event recorder from the locomotive did not indicate whether the train's horn was blown before the accident. An event recorder is a device which records a series of statistical information from the locomotive. At the time of the accident, federal regulations required that the event recorder record train speed, selected direction of motion, time, distance, throttle position, and applications of various brakes. 49 C.F.R. § 229.135. Although, event recorders may also record horn handle positions if they are hooked up to the horn, this is not required. According to Defendants, the horn handle positions were not recorded by the event recorder on the locomotive involved in the accident and Plaintiff has produced no proof to the contrary.

Thus, there is no basis to conclude that this evidence ever existed, much less that it was destroyed by Defendants.

Plaintiff further argues that the footage from the locomotive's Railview camera, a camera placed in the front of the locomotive that records the visibility from the cab of the locomotive, was destroyed. The installation of such cameras is optional and is not required by any federal regulations. The locomotive in question had Railview equipment installed. After the accident, the Railview DVR was removed from the train and sent to the Transportation Data Center in Roanoke, Virginia so that its contents could be downloaded. However, the last entry on the Railway DVR occurred in July 2010, about three months before the accident. No data existed for the day of the accident, or any trips in the last three months prior to the accident. Still, the data from the Railview DVR was downloaded and preserved and the DVR was sent to the manufacturer to be repaired and put back into service. Plaintiff is suspicious about Defendants' claim that there was no footage of the accident on the DVR. Plaintiff first points to the fact that there is some conflicting testimony between the agent who removed the DVR from the locomotive, Claim Agent Brumleve, and the employee at the Transportation Data Center who downloaded the data, Adam Mastrangelo, about when each of them knew that there was no footage on the DVR from October 15, 2011, the date

of the accident. According to Plaintiff, Claim Agent Brumleve testified that Mastrangelo emailed or called her within a week or so of the accident and informed her that there was no video of the accident. However, Mastrangelo testified that he did not check the content of the DVR recorder until May 9, 2012. Regardless, simply because two witness gave conflicting testimony about *when* they knew that there was no video does not prove that the video existed and was destroyed by Defendants. Plaintiff also takes issue with the fact that, after the data was downloaded from the DVR recorder, the DVR recorder itself was sent to the manufacturer to be repaired and put back into service before it could be examined by Plaintiff. However, according to Mastrangelo's testimony, this was done pursuant to normal business practices and Plaintiff has offered no evidence to suggest otherwise. Although Plaintiff seeks a finding by the Court that Defendants are simply lying about the non-existence of a video recording from the date of accident, it has offered no evidence – other than mere suspicions and speculations – that this is the case.

Plaintiff also suggests the possible presence of a "second locomotive" that, according to Plaintiff, could have had its own Railview camera system. Plaintiff's suspicion is based on references in testimony and documents to a "lead" locomotive, as well as the police report from the accident, describing the

train as having two locomotives and 18 cars. Defendants correctly point out that the police report is not admissible into evidence and, regardless, the description on the police report is simply a mistake. Defendants submit a consist of the train, or listing of the locomotives and cars that make up the train, showing that there is only one locomotive, which would be referred to as the "lead" locomotive, whether or not there were multiple locomotives. Regardless of whether a second locomotive existed, Plaintiff merely speculates that this mystery locomotive may have also had a Railview camera. Such extreme speculation is simply insufficient to show that any footage from this camera ever existed, much less that it was destroyed.

Plaintiff also takes issue with the fact that the engineer's statement was not taken until nearly nine months after the accident. However, a delay in taking the statement of a witness is not spoliation.

In support of Plaintiff's argument that summary judgment should be denied because Defendants destroyed evidence, Plaintiff offers nothing more than suspicions, skepticism, and speculation. However, there is no proof that any of the evidence on which Plaintiff relies ever existed, much less that it was destroyed by Defendants. Plaintiff's arguments, while creative, are certainly not enough to warrant the extreme sanction of precluding summary judgment on spoliation grounds.

## IV. Conclusion

For the reasons set forth above, the Court, being fully and sufficiently advised, hereby **ORDERS** as follows:

1. Defendants' Motion *in Limine* seeking to prevent Plaintiff from introducing evidence regarding prior malfunctioning of the signals at the railroad crossing [D.E. 25] is **GRANTED;**

2. Defendants' Motion for Summary Judgment [D.E. 42] is **GRANTED**;

3. Judgment in favor of Defendants will be entered contemporaneously herewith;

4. This matter is **STRICKEN** from the active docket of the Court; and

5. This is a final and appealable Order and no just cause for delay exists.

This the 26th day of February, 2014.



Signed By:

*Joseph M. Hood*

Senior U.S. District Judge